# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-09-3996 |
| | § | |
| CRAIG A. WASHINGTON, SR., *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff the United States of America (the "United States") seeks to recover taxes allegedly owed by defendant Craig Washington, Sr. for the tax years 1988, 1989, and 1990, by foreclosing on three parcels of real property that Washington claims are owned by defendant Washington Children's Trust Number 1 (the "Trust").  On July 25 through July 26, 2011, the court conducted a non-jury trial in this matter.  The court has considered the evidence and arguments of counsel presented at trial, the parties' briefing, and the applicable law, and the court now enters the following findings of fact and conclusions of law.[1]

## I. FINDINGS OF FACT

From a preponderance of the evidence, the court finds as follows:

**A.    The Property at Issue**

1.    On August 16, 1976, Craig A. Washington, Sr., purchased real property located at 2323 Caroline Street, Houston, Harris County, Texas, which is more fully described as follows:

---

[1]  Any finding of fact that should be construed as a conclusion of law is adopted as such, and any conclusion of law that should be construed as a finding of fact is adopted as such.

Lot Seven (7) and the South 50 of the West 25 feet of Lot Fifteen (15) in Block "C" of the Subdivision of 10 acre Lot Eight (8) of the James S. Holman Survey, Harris County, Texas, according to the map or plat thereof recorded in volume 39 Page 379 of the Deed Records of Harris County, Texas, commonly known as 2323 Caroline.

2.      Currently, 2323 Caroline is an office building.

3.      On August 16, 1976, Washington also purchased real property located at 1313 McIlhenny,

        Houston, Harris County, Texas, which is more fully described as follows:

The Northwesterly 25 feet of Lot Eight (8) and the adjoining Southeasterly 25 feet of the Southwesterly 50 feet of Lot Fifteen (15) in Block "C", of the Subdivision of 10 acre Lot Eight (8) of the James S. Holman Survey, in Harris County, Texas according to the map or plat thereof recorded in Volume 39, Page 379 of the Deed Records of Harris County, Texas commonly known as 1313 McIlhenny.

4.      Currently, 1313 McIlhenny is a parking lot for the office building at 2323 Caroline.

5.      On September 8, 1976, Craig A. Washington, Sr., purchased real property located at 2317

        Caroline Street, Houston, Harris County, Texas, which is more fully described as follows:

Lot Six (6) and the adjoining West 25 feet by 50 feet of Lot Fifteen (15) in Block "C" of the W.J. HUTCHINS ADDITION SOUTH SIDE SUBDIVISION of 10 Acre Lots Eight (8) and Twenty (20) of the J.S. HOLMAN SURVEY, Harris County, Texas, according to the Map thereof recorded in Volume 39, Page 379 of the Deed Records of Harris County, Texas, commonly known as 2317 Caroline.

6.      Currently, 2317 Caroline is a parking lot for the office building at 2323 Caroline.[2]

**B.      The Trusts**

7.      In or around 1984, Washington began investing heavily in other real property, including a

        duplex in Austin, Texas, two apartment buildings, a nightclub, and land in various locations

        throughout Texas, with the intention of providing for his children in the event of his untimely

        death.

---

[2] Hereinafter, 2323 Caroline, 2317 Caroline, and 1313 McIlhenny will be referred to, collectively, as the "Property at Issue."

2

8. In 1989, U.S. Congressman Micky Leland passed away, and Washington was elected to the 19th Congressional District in the City of Houston as Leland's successor.  He remained in Congress until 1994.

9. Before this election, Washington was a practicing lawyer with his own law firm in Houston, Texas.  Washington discontinued the practice of law while he was in Congress because members of Congress cannot continue practicing law.  However, he returned to his practice after he left Congress in late 1994 or early 1995.

10. Washington's inability to practice law during his tenure as a member of Congress caused a significant decrease in Washington's salary.  When Washington realized he would be unable to continue practicing law while serving in Congress, in 1989, he decided to create trusts for his children so that he could ensure that they had the benefit of what he had earned prior to being elected to Congress.

11. At some point in or around 1989, Washington consulted with Sidney Braquet, an estate-planning lawyer, about creating trusts for his children.  Braquet recalls Washington asking him whether the trusts should be revocable or irrevocable.  Braquet strongly encouraged Washington to make the trusts irrevocable.

12. Washington, with help from his secretary, created a template for the trusts using a form book, which was recommended by Braquet.  Washington relied on the portion of the form book relating to the creation of irrevocable trusts when he created the template, which was a template for an irrevocable trust.  *See* Defs.' Exh. 11.

13. At some point thereafter, likely also in 1989, Washington used the template to create the Trust, which is an irrevocable trust, for the benefit of his children Craig Anthony Washington

II, Chival Antoinette Washington, Alexander Hallow Washington, Cydney Alexandra Washington, and Christopher Alfred Washington.[3]  Craig A. Washington and Chival A. Washington each own 20% of the Trust.  Alexander H. Washington owns 40% of the Trust.  And, Cydney A. Washington and Christopher A. Washington each own 10% of the Trust.

14.   Washington originally intended to deed at least ten pieces of real property to the trusts he created.  He did deed property located at 3443 Palm Street in Houston, Texas, to the Trust, but that property was sold during Washington's bankruptcy.[4]

15.   Washington is trustee of the Trust as well as custodian of records.  He does not collect a fee for these duties.

**D.     Financial Issues: 1988 and 1989 Taxes Assessed, Bankruptcy Filed**

16.   On January 8, 1990, a delegate of the Secretary of Treasury assessed taxes amounting to $76,971.00 against Washington for the 1988 tax year.

17.   On November 19, 1990, a delegate of the Secretary of Treasury assessed taxes amounting to $21,276.00 against Washington for the 1990 tax year.

18.   On January 11, 1991, Washington filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code.  The bankruptcy was later converted to a Chapter 7 proceeding.

19.   Washington filed for bankruptcy with the intent to reorganize so that he could pay his tax debt.

---

[3]  Washington contends that he created 12 trusts. While the court finds Washington's testimony that he created multiple trusts credible, the court need not make factual findings related to the other trusts since they are not at issue in this litigation.

[4]  There was no testimony as to why this property, which was owned by the Trust, was sold during the bankruptcy to satisfy *Washington*'s debts.

**F.      Lost or Destroyed Evidence**

20.      After Washington was elected to the U.S. Congress and no longer worked at his law firm, many of the documents that Washington had stored at the law firm were moved to a storage facility.  In June 2001, that storage facility flooded during a tropical depression.  The flood destroyed most of the documents contained in the storage facility.

21.      In December 2008, Washington attempted to obtain a loan for one of the trusts that he allegedly created at the same time that he created the Trust.  He searched through his records and was unable to find the trust document he needed, or any of the trust documents, including the Trust.  He testified that he believes that all of the trust documents he created in 1989 must have been stored in the warehouse and destroyed in the 2001 flood.  The court cannot conclude, based on this testimony, that the documents were destroyed in the flood.  However, the court found Washington's testimony relating to a diligent search credible, and it therefore concludes that the document containing the terms of the Trust is either lost or was destroyed during the 2001 flood.

**G.      Proof of Claim**

22.      On September 23, 1992, the Internal Revenue Service ("IRS") filed a Proof of Claim ("POC") in Washington's bankruptcy proceeding for $216,709.81, which included unpaid income tax for the tax years 1987 through 1990, as well as interest and penalties.  Gov't Exh. 16.  The amount of the claim upon which the IRS claimed priority was $178,467.46.  *Id.*

23.      Terry C. Kennemer, a Revenue Officer with the IRS, attended some, but not all, of the creditors' meetings during the bankruptcy.

**H.      Divorce and First Transfer of Property**

24.      Washington and Dorothy M.L. Washington were married in 1965.  They had two children

together—Craig Anthony Washington, II, and Chival Antoinette Washington.[5]

25.      On January 11, 1992, Washington filed for divorce.

26.      On March 10, 1993, pursuant to a property settlement agreement in their divorce,

Washington conveyed the Property at Issue to Dorothy M.L. Washington, and Dorothy M.L.

Washington conveyed real property located at 3001 North Calumet Drive, Houston, Harris

County, Texas (the "Calumet Drive Property"), to Washington.

**I.      1990 Taxes Assessed**

27.      On September 16, 1996, a delegate of the Secretary of Treasury assessed taxes amounting

to $58,250.00 against Washington for the 1990 tax year.[6]

**J.      Bankruptcy Disbursements and Dismissal**

28.      The Bankruptcy Trustee disbursed $230,866.95 during Washington's bankruptcy.  Gov't

Exh. 15.  Over $93,000 of the disbursements were for administrative fees and charges.  *Id.*

Approximately $54,197.23 was paid to the IRS, which only equated to 23.48% of the priority

claim.

29.      On February 28, 2000, Washington's bankruptcy was dismissed.  The 1988, 1989, and 1990

tax debts were neither discharged nor fully paid.

---

[5]  Three of Washington's children, Alexander, Cydney, and Christopher, were born while he and
Dorothy M.L. Washington were still married, but they are not Dorothy's children.

[6]  The United States did not assess these taxes earlier because the automatic stay provisions in the
Bankruptcy Code prohibited the Internal Revenue Service from making an assessment.  After the
Bankruptcy Reform Act became effective in 1994, the Internal Revenue Service was permitted to
assess the 1990 taxes, and it did so in a timely manner thereafter.  *See* 11 U.S.C. § 362(b)(9)(D); Dkt.
30.

**J.      Offer in Compromise Filed and Returned**

30.     On January 3, 2000, Hoover Morris was appointed as Washington's power of attorney for

        dealings with the IRS.  Gov't Exhs. 1, 25; Defs.' Exh. 2.

31.     On August 7, 2000, Morris submitted an Offer in Compromise Form 656 on Washington's

        behalf to the IRS for the 1988, 1989, and 1990 tax debts (the "OIC").[7]  Gov't Exh. 1; Defs.'

        Exh. 2.

32.     The IRS only uses Form 656 for offers in compromise.  Form 656 contains a waiver of the

        statute of limitations for the time period during which the offer in compromise is pending.

        The form expressly provides that the "collection statute of limitation is suspended for all tax

        periods on your offer during the period your offer is pending."  Gov't Exh. 27.  The form

        further explains that an offer is considered "pending" while the IRS investigates and

        evaluates the offer, for 30 days after the IRS rejects the offer, and while the taxpayer appeals

        the offer rejection.  *Id.*

---

[7]  Morris served as Washington's Certified Public Accountant for Washington's 2005–2008 tax returns, which were not filed until August 5, 2010.  Gov't Exhs. 28-31.  Washington claims that he did not authorize Morris to submit the OIC.  However, the court does not find this contention credible, particularly in light of Washington's continued retention of Morris as his CPA and the IRS's documentation relating to the OIC.  Moreover, while not determinative, the court finds it telling that Washington did not call Morris, who is Washington's current CPA, to testify.  "In general, a court may draw a negative inference from a party's failure to produce a witness 'whose testimony would elucidate the transaction.'" *Streber v. C.I.R.*, 138 F.3d 216, 221 (5th Cir. 1998) (quoting *Graves v. United States*, 150 U.S. 118, 121, 14 S. Ct. 40 (1893)).  "The strength of the inference 'is rooted in notions of common sense[,] . . . will vary with the facts of each case,' *United States v. Tucker*, 552 F.2d 202, 210 (7th Cir. 1977), and may be drawn only where a witness has information 'peculiarly within his knowledge,' *McKay v. Commissioner*, 886 F.2d 1237, 1238 (9th Cir. 1989) (citing *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165, 1946 WL 298 (1946))."  *Id.* at 221-22.

33.    On January 24, 2001, Washington's OIC was returned, as the IRS had been unable to obtain all of the information it needed to accept or reject the offer.[8]  Defs.' Exh. 2.  The OIC was thus pending 170 days.

**K.**    **Tax Liens Filed in Harris County Property Records**

34.    On November 29, 1999, the United States recorded a Notice of Federal Tax Lien against Washington in the real and personal property records of Harris County, Texas, for the 1988, 1989, and 1990 tax years.  Gov't Exh. 24.  The liens for each tax year had different refiling deadlines: the 1988 refiling deadline was February 7, 2000; the 1989 refiling deadline was December 19, 2000; and for 1990, the refiling deadline was October 16, 2006.  Gov't Exh. 24.

35.    On November 6, 2000, the United States recorded a Notice of Federal Tax Lien refiling for the 1989 tax period in the real and personal property records of Harris County, Texas.  There was no refiling deadline on this lien.  Gov't Exh. 24.

**L.**    **Second Conveyance of Properties**

36.    On June 23, 2004, Dorothy M.L. Washington conveyed the Property at Issue which was valued at $479,060.00, to Washington as Trustee of the Trust.  Gov't Exh. 21-23.  Before this

---

[8]  The IRS no longer has the original OIC document, but the details of the offer are adequately set forth in the IRS's automated files.  *See* Gov't Exh. 1.  Terry Kennemer, an Internal Revenue and Fraud and Technical Advisor for the IRS, testified that Code 960 on the account transcript is a code indicating that a power of attorney has been filed.  The date associated with Code 960 on the transcripts for the 1988, 1989, and 1990 tax years is January 3, 2000.  The next entry in the transcripts is Code 480, which is dated August 7, 2000.  Kennemer testified that this code means an offer in compromise has been submitted.  The next entry is Code 481, which is dated January 24, 2001.  Kennemer testified that this code is a reversal of Code 480, meaning the OIC was denied.

8

transfer, Dorothy M.L. Washington had been receiving rent from the tenants of 2323 Caroline, and she discontinued receiving rent from them after the transfer.

37.   The Warranty Deeds conveying the Property at Issue state that Dorothy M.L. Washington, "in consideration for the sum of **TEN AND NO/100 DOLLARS** and other valuable consideration to the undersigned paid by the grantee herein named . . . have **GRANTED, SOLD AND CONVEYED** . . . unto **CRAIG A. WASHINGTON** as Trustee of the Washington Children's Trust Number 1 . . .all of my interest in [the Property at Issue]." Dkt. 27, Exh. 4.  As consideration, the Trust paid an outstanding judgment for ad valorem taxes for 2317 Caroline and 1313 McIlhenny of approximately $50,000.  Both of these properties had been listed for foreclosure by the local taxing authorities.

38.   Also on June 23, 2004, Washington conveyed the Calumet Drive Property, which was valued at $340,700.00, to Dorothy M.L. Washington.  *See* Gov't Exh. 20.  The consideration for this conveyance was, according to Washington, the comfort of knowing that his children and former wife would have a decent place to live.

39.   Dorothy M.L. Washington considered Washington's transfer of the Calumet Drive property to her and her transfer of the Property at Issue to Washington as trustee of the Trust, to be an even exchange.

40.   These conveyances were recorded in Harris County property records.

41.   No federal gift tax returns were filed with the IRS reporting these conveyances.

**M.   Notice that Washington Still Owed Taxes for 1988-1990**

42.   In August 2005, Washington received notice that the IRS was taking money out of his retirement account to pay back taxes.  *See* Gov't Exh. 17.  The notice does not specify the

9

tax years for which the funds were being levied.  Washington claims that he did not know what tax year or years to which this letter related and that he continued to believe that his tax debts had been discharged during his bankruptcy after the receipt of this letter.  The court finds that such a letter would spur a reasonable person to investigate why the IRS was taking money out of his retirement funds.  Thus, the court does not find Washington's testimony about his belief that the taxes had been discharged, at least as of August 2005, credible.

**N.   Washington as Tenant and Trustee**

43.   Washington maintains a bank account for the Washington Children's Family Trust (the "Trust Bank Account").  The Trust Bank Account purportedly contains funds related to the Trust and several other trusts created for the benefit of Washington's children and Washington's brother's children.

44.   Washington resides at 2841 Highway West, Cedar Creek, Bastrop County, Texas (the "Cedar Creek Property").  The Cedar Creek Property is owned by the Washington Children's Trust Number 2, which has the same beneficiaries as the Trust.  Washington pays, or intends to pay, $1,000 a month rent for the Cedar Creek Property to the Washington Children's Trust Number 2.  He does not pay this rent every month, but he catches up when he is behind, and he is currently ahead on rent for the Cedar Creek Property.

45.   Washington has maintained his law practice out of the office building at 2323 Caroline since he left Congress in late 1994 or early 1995.  Dorothy M.L. Washington received rental

payments for Washington's use of the office from the United States government prior to her transfer of the building to the Trust.[9]

46.    In addition to Washington's law practice, several other attorneys or firms have offices at 2323 Caroline. Washington currently is both a tenant of the building and, as trustee of the Trust, landlord to the other tenants.

47.    Many of the attorneys who are tenants of 2323 Caroline are Washington's mentees,[10] and Washington allows them to rent space in the building for only $150.00 a month. The rent for other tenants is $1,500.00 per month. Washington claims his rent is $15,000 per month.

48.    Washington uses funds from the Trust Bank Account to pay expenses associated with 2323 Caroline including furniture for the shared areas, Direct TV for the television in the lobby, and cleaning services.

49.    Washington also uses funds from the Trust Bank Account to pay expenses relating to other trusts that share the account even though 2323 Caroline, which is owned by the Trust, is the only significant income-producing property owned by any of the trusts.[11]  For example,

---

[9]  Dorothy M.L. Washington testified that she received payments from the District Office for Washington's rent and referred to the payment as a "congressional payment."

[10]  Washington testified that when he was a young lawyer three attorneys helped him establish his practice by allowing him to office in their building for little to no rent. Washington claims that he likes to return this favor by allowing young lawyers to office at 2323 Caroline for only $150.00 per month while he mentors them. He claims that his children, who are the beneficiaries of the trust that owns the building, know about his mentoring practices, which include allowing young lawyers to get their start by practicing out of 2323 Caroline while paying very little rent.

[11]  A separate trust that shares the Trust Bank Account owns Washington's residence, and Washington pays $1,000 per month rent for use of this property. Thus, this property also produces income. However, the court does not find this income to be substantial in relation to the income-producing capability of 2323 Caroline, nor does this fact affect the court's conclusions of law in any other fashion.

Washington wrote a check from the Trust Bank Account for lawn care at 2509 Third Street in Galena Park, Texas, which Washington contends is owned by the Washington Children's Trust Number 6.

50. Washington also "disbursed" funds from the Trust Bank Account to the beneficiaries of the Trust by using the funds from the account for college expenses of the beneficiaries, an airline ticket for one of the beneficiaries, gifts for the beneficiaries' children or their mothers, and a graduation cake for one of the beneficiaries. Washington did not keep a spreadsheet of the expenses he paid for each beneficiary. However, he does advise his children from time to time about the expenses the Trust pays.

51. Washington admits that he wrote checks from the Trust Bank Account for some items that should not have been purchased with the Trust's funds, though he states that any such instances were merely mistakes. For example, he used funds from the Trust Bank Account for his law practice when he purchased a copy machine, and he admits that the Trust's funds should not have been used for this purpose. He also cannot adequately account for some of the purchases made via the Trust Bank Account, including purchases from Barnes and Noble and Coach.[12]

52. Washington used funds from the Trust Bank Account to pay taxes for lots that he personally owns in Galveston County. These checks amounted to more than $8,000.00.

---

[12]  The debit from Barnes and Noble was for $255.84. Washington does not recall what the Trust needed at Barnes and Noble. The debit from Coach was for $290.11. Washington credibly testified that he does not own anything from Coach and that the debit must have been for one of the Trust's beneficiaries.

53.   Washington received a loan from the Trust for $5,000 to pay his law firm staff.  He wrote the check himself, but he obtained permission from the Trust beneficiaries first, and he paid the loan back with interest soon thereafter.

54.   Washington claims he pays rent of $15,000.00 a month to the Trust to maintain his office at 2323 Caroline.  However, while the evidence presented at trial demonstrates that Washington intends to pay $15,000 per month in rent, he does not actually pay $15,000 per month. Washington has not kept adequate records of the payments he has made, so it is unclear how much he has actually paid in rent from the time Dorothy M.L. Washington conveyed it to the Trust.  However, he has made payments that are clearly more than nominal.

55.   Sometimes the rent takes the form of payments to the Trust Bank Account, and sometimes Washington "pays" rent in other ways, such as by paying, from his own funds, ad valorem taxes, electricity, gas, repairs, maintenance, and trash pick-up for the properties owned by the Trust or other properties owned by other trusts that allegedly share the Trust Bank Account.[13]

56.   For instance, Washington paid off the mortgage the Cedar Creek Property in 2006 with $245,944.28 in personal funds.  Washington considers this payment to be a form of rental payment to the Trust for the office at 2323 Caroline, as one of the trusts that shares the Trust Bank Account and benefits the same beneficiaries in the same percentages owns the Cedar Creek Property.  If one includes this payment and the ad valorem taxes for the Cedar Creek Property, which Washington also paid in 2006, to be rent for 2323 Caroline, then

---

[13]  Washington claims that the other trusts are also for the ultimate benefit of his children, in the same percentages as the Trust.  The only alleged trust that does not solely benefit Washington's children is Washington Children's Trust Number 6.  Washington's brother's children own a life estate in this alleged trust, which owns a residence in Galena Park, Texas, that once belonged to Washington's father.

Washington paid approximately $290,000 in "rent" to the Trust or other trusts that share the Trust Bank Account. However, he only claimed $43,986.00 as rental expense on his federal income tax form.[14]

57.     Despite the rental income received by the Trust, Washington has never filed a federal income tax return on behalf of the Trust.

**N.     Erroneous Release of Liens**

58.     On June 22, 2008, the United States erroneously released the November 29, 1999 lien and the November 6, 2000 lien.

59.     On July 24, 2008, the United States filed a Revocation of Certificate of Release of Federal Tax Lien. The United States filed a Notice of Federal Tax Lien against Washington in the Harris County records for the income tax years of 1988, 1989, and 1990 on the same day.

60.     On August 18, 2009, the United States filed a Notice of Federal Tax Lien against Washington Children's Trust No. 1 as nominee of Washington in the Harris County records for the income tax years 1989 and 1990.

**O.     Current Assets and Amount Owed**

61.     Washington's current assets, held in his own name, include art, furniture, five trucks, three cars, clothing, suits, exercise equipment, a set of Congressional china, a coin collection, a collection of firearms, television sets, VCRs, video cameras, two refrigerators, books, twelve desks, a few head of cattle, property in Galveston, land in Brazoria County, a mineral interest

---

[14]  If one pays $15,000 rent per month, the yearly rental fees are $180,000.

in land in Nacogdoches County, a lot on Blodgett Street in Houston, and potentially an interest in a piece of land in Dallas on Pine Street.[15]

62.   The total amount due from Washington for unpaid income taxes, penalties, statutory additions, and interest through July 4, 2011 for the 1988 tax year is $444,255.22.

63.   The total amount due from Washington for unpaid income taxes, penalties, statutory additions, and interest through July 4, 2011 for the 1989 tax year , is $66.875.47.

64.   The total amount due from Washington for unpaid income taxes, penalties, statutory additions, and interest through July 4, 2011 for the 1990 tax year is $95,106.31.

**P.**   **Filing of Lawsuit**

65.   The United States filed this lawsuit on December 15, 2009.

66.   As proof of the amounts owed, the United States offers certified account transcripts.  These transcripts are accompanied by certifications indicating that they are "true transcript[s] of account of the U.S. Individual Income Tax Return (Form 1040) for Craig A. & Dorothy L. Washington . . . ." *Id.*

## II. CONCLUSIONS OF LAW

**A.**   **Statute of Limitations**

1.   The court has already ruled that the statute of limitations on collection claims for the 1989 and 1990 years has not expired.  *See* Dkt. 39 at 8.  The court, however, reserved ruling on the statute of limitations issue with regard to Washington's 1988 taxes until after trial, as there was a question of fact as to whether an offer in compromise extended the limitations period. *See id.*

---

[15] Washington testified as to these assets during the trial, and the court found the testimony credible. Washington indicated that this is likely not an exhaustive list of his current assets.

2.    Under section 6502(a)(1), "a tax may be collected by levy or by a proceeding in court" only if "the levy is made or the proceeding begun . . . within 10 years after the assessment." 26 U.S.C. § 6502(a)(1).

3.    However, under section 6503(h), the "running of the period of limitations provided in section . . . 6502 on the making of assessments or collection shall, in a case under title 11 of the United States Code, be suspended for the period during which the Secretary is prohibited by reason of such case from making the assessment or from collecting and . . . for collection, 6 months thereafter." 26 U.S.C. § 6503(h).

4.    Washington filed for Chapter 11 bankruptcy on January 11, 1991, and his case was not dismissed until February 28, 2000.  Gov't Exh. 13.  The 1988 taxes were already assessed on the date Washington filed for bankruptcy, so the statute of limitations for the 1988 taxes was tolled for the entire time that the bankruptcy was pending, plus six months.  There were 3,335 days between January 11, 1991 and February 28, 2000.  There are approximately 182 days in six months.  So, the court must add 3,335 days plus 182 days to the normal date on which limitations would have run for the 1988 tax year, January 8, 2000.  The new date on which the statute of limitations would have run for the 1988 tax year, based on these calculations, if the bankruptcy were the only event that suspended the limitations period, is August 25, 2009.  If this were the only event suspending the statute, the filing date of this action, December 15, 2009, would be beyond the limitations period for the 1988 tax year.

5.    However, under section 6331(k)(1) of the Internal Revenue Code, no levy may be made on property or rights to property of any person with respect to unpaid tax during the period that an offer in compromise is pending and, if such offer is rejected by the Secretary, for 30 days

thereafter.  26 U.S.C. § 6331(k)(1).  Additionally, under section 6331(i)(5) of the Internal Revenue Code, the period of limitations under section 6502 shall be suspended for the period during which the Secretary is prohibited from making a levy.

6.    In addition to the statutory suspension of the statute of limitations during the pendency of an offer in compromise, the Offer in Compromise Form 656 advises that the statute shall be suspended while the offer is pending, for 30 days after the IRS rejects the offer, and while the taxpayer appeals the offer rejection.  Since there was an OIC that included the 1988 tax year submitted in this case on August 7, 2000 and the IRS returned the offer on January 24, 2001, the offer was pending for 170 days.  After adding the 30 days discussed in section 6331(k)(1) of the Internal Revenue Code and Form 656, the court finds that the statute of limitations for the 1988 tax year was suspended for an additional 200 days.  After adding these 200 days to the date on which the statute would have expired if there had been no offer in compromise, August 29, 2009, the court finds that the new date on which the statute of limitations expired for the 1988 tax year, taking the bankruptcy and the OIC into account, is March 17, 2010.  Since this action was filed on December 15, 2009, this court finds, as a matter of law, that the United States filed the claim for the 1988 tax year within the limitations period.

**B.    Amount of Debt**

7.    "A Certificate of Assessment and Payment . . . has been held to be presumptive proof of a valid assessment where the taxpayer has produced no evidence to counter that presumption." *United States v. McCallum*, 970 F.2d 66, 71 (5th Cir. 1992) (citing *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991)).  A certificate of assessments and payments is an official

record of the taxpayer liability.  *See Godfrey v. United States*, 997 F.2d 335, 339 (7th Cir. 1993).

8.      Here, the United States submitted certified account transcripts rather than certificates of assessment.  *See* Gov't Exh. 1.  In *Godfrey*, the Government submitted a certified account transcript rather than a certificate of assessments and payments to show that it mailed refund checks to the taxpayer.  *See Godfrey*, 997 F.2d at 339.  The Seventh Circuit declined to afford the certified account transcripts the same probative value as a certificate of assessments and payments, noting that an appropriate entry in a certificate of assessments and payments gives rise to an inference that notices were sent by the Internal Revenue Service, but the single entry in the account transcript relating to refund checks, without further explanation regarding IRS procedures, did not support an inference that the refund check or checks were mailed.  *See id.* & n.5.  Other courts, however, have relied on certified transcripts of accounts as presumptive evidence of *assessments*, as opposed to evidence of *mailing. See, e.g.*, *United States v. Kennedy*, No. H-07-3437, 2008 WL 4200780, at *3 (S.D. Tex. Sep. 9, 2008) (Werlein, J.) ("Certified transcripts of account are admissible evidence proving an assessment—and enjoy a presumption of correctness.") (citing *United States v. Thurner*, 21 Fed. App's 477, 478 (7th Cir. 2001) (unpublished); *Lindsay v. C.I.R.*, 56 Fed. App'x 800, 801 (9th Cir. 2003) (unpublished); and *United States v. Partin*, No. 71-119, 1973 WL 592, at *1 (M.D. La. July 5, 1973)); *Lewis v. United States*, No. 02-2958-B/An, 2007 WL 1720435, at *3 (W.D. Tenn. Apr. 17, 2007) ("[F]ederal courts have recognized that certified 'transcripts of account' are admissible to establish the presumption of correctness in favor of the [Internal Revenue] Service." (citing *Lindsay*, 56 Fed. App'x at 801, and

18

*Hovind v. C.I.R.*, No. 11894-05L, 2006 WL 1867340, at *5 (U.S. Tax. Ct. July 6, 2006, *aff'd*

228 Fed. App'x 966 (11th Cir. 2007))).

9.      Here, the certified account transcripts indicate that Washington owes $444,255.22 for the

1988 tax year, $66,875.47 for the 1989 tax year, and $95,106.31 for the 1990 tax year. The

court finds that these transcripts are admissible evidence giving rise to a presumption that

these amounts are correct. Washington has offered no valid evidence to rebut the

presumption that these amounts are correct. Accordingly, the court finds, as a mater of law,

that Washington's unpaid taxes, interest, and penalties are $444,255.22 for the 1988 tax year,

are $66,875.47 for the 1989 tax year, and are $95,106.31 for the 1990 tax year.

**C.      The 1988 and 1989 Liens**

10.      A federal tax lien is created pursuant to Internal Revenue Code section 6321 when a taxpayer

either refuses or neglects to pay a tax upon demand. 26 U.S.C. § 6321. This federal tax lien

attaches to "all property and rights to property, whether real or personal, belonging to such

person." *Id.* The lien arises automatically as soon as the United States has demanded

payment and the taxpayer has neglected or refused to pay, and it applies to all property

owned by the taxpayer as of or acquired after the date of assessment. 26 U.S.C. § 6322; *see*

*In re DeAngelis*, 373 F.2d 755, 757 (3d Cir. 1967) ("[U]nless another date is fixed by law,

non-payment of taxes after demand creates a lien commencing at the assessment date."). A

section 6321 lien "has aptly been described as a secret lien" as it arises without a tangible

recording of the lien. *Rice Inv. Co. v. United States*, 625 F.2d 565, 568 (5th Cir. 1980).

11.      Here, it is clear that the taxes for the 1988 and 1989 tax years were assessed, demand for

payment was made, and Washington failed or neglected to pay those taxes before the

property was conveyed to Dorothy M.L. Washington during the Washingtons' divorce. Washington admits that he filed for bankruptcy in 1991 because he could not pay the Internal Revenue Service what he owed.  Moreover, the United States filed a proof of claim for the 1988 and 1989 taxes in Washington's bankruptcy proceeding on September 23, 1992.  *See* United States Exh. 16.  The conveyance associated with the divorce occurred on March 10, 1993.

12.  A lien created under section 6121 is not valid "as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor," unless the Government has filed the notice required by section 6323.  26 U.S.C. § 6323.  "The sine qua non of § 6323 is notice to subsequent takers of the existence of the IRS lien."  *Davis v. United States*, 705 F. Supp. 446, 453 (C.D. Ill. 1989).  However, a person who obtains marital property as part of a divorce proceeding or settlement is not a "purchaser" under section 6323, so a section 6321 lien that attached to real property prior to a divorce is valid against a party receiving real property as part of a divorce even if no section 6323 notice has been filed.  *See Harris v. United States*, 764 F.2d 1126, 1129 (5th Cir. 1985) (affirming the district court's holding that a "division of property by the divorce court was a division of marital property rights, not a sale").

13.  Here, since Washington conveyed the Property at Issue to Dorothy M.L. Washington as part of their divorce settlement, she was not a "purchaser," and therefore the lien arising under section 6121 was valid against her, even though the United States had not yet filed a notice of lien under section 6323.  Thus, when the properties were transferred to Dorothy M.L.

Washington in 1993, they were encumbered by the section 6321 liens for the 1988 and 1989 tax years.

14.    In 2000, the United States filed a section 6323 notice of federal tax lien against Washington pursuant to section 6323 for the 1988, 1989, and 1990 tax years in the Harris County real and personal property records.  In 2004, Dorothy M.L. Washington conveyed the Property at Issue, which was encumbered by the section 6321 lien for the 1988 and 1989 tax years, to Washington as Trustee of the Trust.  The Property at Issue, however, was not subject to the section 6323 notice of federal tax lien.  This notice was against Washington, and Washington did not own the Property at Issue at any point in time between the filing of the notice and the conveyance to the Trust; Dorothy M.L. Washington did.

15.    The property was, however, nevertheless, subject to the section 6321 "secret" lien.  This "secret" lien would not have been valid against the Trust if the Trust were a "purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor" because no section 6323 lien attached.  26 U.S.C. § 6323(a).  Here, "purchaser" is the only category that could possibly apply.  A "purchaser" under this section "means a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice."   26 U.S.C. § 6323(h)(6).  The Trust did not pay "adequate and full consideration in money or money's worth" for the Property at Issue.  The consideration, according to the testimony at trial, was approximately $50,000, which was the outstanding ad valorem taxes for 2317 Caroline and 1313 McIlhenny.  The three parcels of property were, together, valued at $479,060.00.  Through this conveyance, Washington, as Trustee,

21

attempted to ensure that the Trust beneficiaries would have an income-producing property—2323 Caroline—and that the parking lots servicing that property would not be sold to satisfy the judgment. However, the definition in the statute calls for *full* consideration in money or money's worth. The Trust did not pay full consideration in money or money's worth. Thus, is cannot be considered a "purchaser" under section 6323. Because it is not a purchaser, the section 6321 lien remains valid against the Trust even though there was no section 6323 lien attached to the property at the time of conveyance.

16.    While the United States erroneously released the section 6323 notice of lien and later revoked the erroneous release in 2008, the release and revocation do not alter the fact that continuously from 1990 until the present the Property at Issue is encumbered by the federal tax lien that arose on assessment of Washington's 1988 and 1989 tax liabilities.

17.    Because the property continues to be encumbered by liens for taxes from 1988 and 1989, the United States may foreclose on the Property at Issue to satisfy the debt, notwithstanding the fact that the Property at Issue is now owned by the Trust.

**D.    The 1990 Lien**

18.    Since Washington no longer owned the Property at Issue when the 1990 taxes were assessed in 1996, as the properties were conveyed to Dorothy M.L. Washington during their divorce in 1993, no section 6321 "secret" lien attached to the properties for that tax year. Washington has not technically owned the Property at Issue at all since the 1990 taxes were assessed. A tax lien, however, may still attach to the Property at Issue for the 1990 tax year if (1) the Trust is a revocable trust and Washington placed his assets in the Trust to shield them from his creditors; (2) the 2004 transfers—from Washington to Dorothy M.L.

Washington and then from Dorothy M.L. Washington to the Trust—were fraudulent under Texas Business and Commerce Code § 24.005(a)(1); (3) the transfers were fraudulent under Texas Business and Commerce Code § 24.006(a); (4) the Washington Children's Trust Number 1 is a sham trust; or (5) the Trust is the alter ego or nominee of Washington. Washington argues that the Trust is a valid, irrevocable trust that he created to provide for his children and that the Texas statutory claims are barred by the statute of limitations contained in section 24.010 of the Texas Business and Commerce Code.

### 1.    *The Trust is an Irrevocable Trust That Was Lost or Destroyed.*

19.    Under Texas law, a debtor "cannot shield his assets by placing them in a revocable trust for his own benefit." *United States v. Estabrook*, 78 F. Supp. 2d 558, 560-61 (N.D. Tex. 1999) (citing *Matter of Brooks*, 844 F.2d 258, 261 (5th Cir. 1988)).  Thus, if a debtor places assets in a revocable trust and hence retains the right to revoke the trust, the assets are considered property of the estate.  *See Askanase v. Living Well, Inc.*, 45 F.3d 103, 106 (5th Cir. 1995) ("[W]hat comes to the bankruptcy estate is not only the property in which the debtor has an interest, but also the powers the debtor can exercise for its own benefit over property regardless of the title [the] debtor may be acting under." (citations and quotations omitted)). A trust is revocable unless "the express terms of the instrument creating [the trust] or of an instrument modifying it" specify that it is irrevocable.  Tex. Prop. Code Ann. § 112.051(a) (Vernon 2007).  Irrevocability cannot be inferred or implied.  *McCauley v. Simmer*, 336 S.W.2d 872, 881 (Tex. Civ. App.—Houston 1960, writ dism'd).

20.    A person seeking to enforce a purported trust in real property must present "written evidence of the trust's terms bearing the signature of the settlor or the settlor's authorized agent." Tex.

Prop. Code Ann. § 112.004 (Vernon 2007).  However, pursuant to Texas Rule of Evidence 1004 and Federal Rule of Evidence 1004, other evidence can be admitted to show the contents of a writing if the original is lost or destroyed.  Fed. R. Evid. 1004; Tex. R. Evid. 1004; *see In re Estate of Berger*, 174 S.W.3d 845, 847 (Tex. App.—Waco 2005, no pet.). For instance, in *Berger*, the Waco Court of Appeals held that there was "more than a scintilla of evidence that [a] trust agreement was lost" when the party asserting its existence filed an affidavit discussing when she originally saw the document, what the first page of the document said, and when and where she last saw the document.  *Id.* at 848.  The details of this affidavit were sufficient to "raise[] a genuine issue of material fact on the question of whether [the affiant was] the beneficiary of the purported trust agreement . . . ."  *Id.*

21.    Here, the court does not construe the Trust to be a revocable trust as a matter of law because, even though there is currently no trust document, the evidence presented at trial demonstrates that Washington created the Trust, that the Trust was lost or destroyed, and that the Trust is an irrevocable trust.  Since Washington has not retained the right to revoke the Trust, the court does not consider the assets of the Trust to be Washington's assets simply because he cannot provide the Trust document.

   **2.    *The Texas Uniform Fraudulent Transfer Act ("TUFTA") Does Not Extinguish the Transfers.***

      **a.    *Statute of Limitation: Section 24.010***

22.    Section 24.010 of the Texas Business and Commerce Code extinguishes a fraudulent transfer cause of action brought under section 24.005(a) if it was not brought within four years after the transfer or within one year after the transfer was or could reasonably have been

discovered, and it extinguishes a cause of action under section 24.006(a) if it was not brought within four years after the transfer.  Tex. Bus. & Com. Code Ann. § 24.010.  However, "TUFTA's four-year extinguishment provision does not apply to the federal government." *United States v. Evans*, 513 F. Supp. 2d 825, 838 (W.D. Tex. 2007), *aff'd* 340 Fed. App'x 990, 993 (5th Cir. 2009); *see also United States v. Summerlin*, 310 U.S. 414, 416, 50 S. Ct. 1019 (1940) ("It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights.").

23.    Here, even though the United States brought its claims under sections 24.005(a) and 24.006(a) more than four years after the 2004 transfer, because the claimant is the United States, the claims are not barred by TUFTA.

### b.    Fraudulent Conveyance: Section 24.005

24.    TUFTA "provides remedies to creditors of debtors who fraudulently transfer assets under certain conditions."  *Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.] 2009, no pet.).  Under TUFTA, "a conveyance which is found to be fraudulent as to creditors is wholly null and void as to such creditors, and the legal as well as equitable title remains in the debtor for the purpose of satisfying debts."  *Cal. Pipe Recycling, Inc. v. Sw. Holdings, Inc.*, No. H-09-2502, 2010 WL 56053, at *5 (S.D. Tex. 2010) (Rosenthal, J.) (internal quotations omitted) (quoting *United States v. Chapman*, 765 F.2d 1237, 1240 (5th Cir. 1985)).  "The purpose of TUFTA is to prevent debtors from defrauding creditors by placing assets beyond their reach."  *Id.*  "The creditor seeking to set aside a transfer has the burden to establish by a preponderance of the evidence that the conveyance was by fraud."

*Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no

pet.).

25.     The United States contends that the transfer of properties between Washington, Dorothy

M.L. Washington, and the Trust in 2004 violates sections 24.005(a) and 24.006(a) of

TUFTA.  Under section 24.005,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with *actual intent* to hinder, delay, or defraud any creditor of the debtor . . . .

Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (Vernon 2009) (emphasis added).

26.     The following "badges of fraud" must be considered to determine if there was "actual intent

to hinder, delay, or defraud" the United States:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all of the debtors' assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code Ann. § 24.005(b) (Vernon 2009).  "An individual badge of fraud is

not conclusive, but 'a concurrence of many [badges] in the same case will always make out

a strong case of fraud.'" *Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 313 (Tex. App.—El Paso 2009, mandamus denied) (citations omitted).  If "several of these 'badges of fraud' are found, they can be a proper basis for an inference of fraud."  *Mladenka*, 130 S.W.3d at 405.

27.     The United States has made a sufficient showing that the first, second, and eighth badges of fraud are present in this case.  However, the United States has not sufficiently shown that badges 3, 4, 5, and 9 should apply, and, the United States offered no evidence supporting the application of badges 6, 7, 10, or 11.

28.     As to the first badge, it is relatively clear that the transfers were to insiders.  This situation is unusual because it involves a three-way transfer of property.  However, whether the court is looking at Washington's intent with regard to his transfer of the Calumet Drive Property to Dorothy, Dorothy's intent with regard to her transfer of the Property at Issue to the Trust, or Washington's intent with regard to the entire circular transaction, the transfers were to insiders because Dorothy M.L. Washington is Washington's ex-wife and the mother of two of his children, and the Trust's beneficiaries include these two children.

29.     The evidence also establishes that the debtor, Washington, maintained possession or control of the property after the transfer—the second badge.  Washington maintained his law practice out of 2323 Caroline both before and after the transfer.  He only pays rent to the Trust sporadically, and he continues to allow his mentee tenants to pay minimal rent.[16]

---

[16]  The court notes that there is no evidence that Washington had possession or control of the Calumet Drive Property either before or after the transfer.  Dorothy M.L. Washington lived in the house located on that property both before and after the transfer.  It is unclear how the circular nature of the transfers at issue here and the fact that the United States seeks to foreclose on the property Dorothy M.L. Washington transferred rather than the property Washington transferred impacts this

30.  The United States has also shown that Washington and Dorothy M.L. Washington did not receive "reasonably equivalent values" for the properties they transferred—badge eight. Section 24.004 of TUFTA defines "reasonably equivalent value" as including, "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." Tex. Bus. & Com. Code Ann. § 24.004(d). "Value is determined as of the date of transfer." *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000). "Intangible, non-economic benefits . . . do not constitute reasonably equivalent value." *Id.* at 643. "The value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors." *Id.* at 644.

31.  Washington did not receive reasonably equivalent economic consideration for his transfer of the Calumet Drive Property to Dorothy M.L. Washington, and Dorothy M.L. Washington did not receive reasonably equivalent economic consideration—from the Trust—for her transfer of the Property at Issue. Washington testified that his consideration for the transfer of the Calumet Drive Property to Dorothy M.L. Washington was, in fact, completely nonmonetary—it was the comfort of knowing that his children and former wife would have a decent place to live. While the court found this testimony credible, it does not meet the statutory definition of "reasonably equivalent value."

32.  With regard to the consideration paid by the Trust for the Property at Issue, Washington testified that the Trust paid the overdue ad valorem taxes on two of the three pieces of property, and that the tax debt had already been reduced to a judgment and Dorothy M.L.

prong.  However, even if the court considers this prong to weigh in favor of the United States, in toto, the badges weigh against the application of section 24.005(a).

Washington was in danger of losing the two properties altogether. The taxes, however, were not equivalent in monetary value to the value of the properties. Washington credibly testified that he and Dorothy M.L. Washington had originally begun investing in real estate in order to provide for their children and that his motivation in effectuating the transfer was in furtherance of that goal. Dorothy M.L. Washington was in danger of losing two of the three properties before the transfer to the Trust, and Washington could ensure, with the transfer of all three properties to the Trust, that the taxes were paid and the children would not lose this benefit. However, while this may have been sufficient consideration subjectively, it was not "reasonably equivalent consideration."

33. The United States has not made a sufficient showing that the remaining badges apply in this case. As to the third badge, whether the transfers were concealed, the United States contends that the transfers were concealed because neither Washington nor Dorothy M.L. Washington filed gift tax returns relating to the transfers. However, the transfers were recorded in Harris County property records, so the court finds that, for the purposes of this test, the transfers were not concealed.

34. As to the fourth badge, whether Washington had been sued or threatened with suit before the transfer was made or obligation was incurred, the United States contends that Washington knew that he had an outstanding tax debt. However, the factor specifically asks if Washington had been *sued or was threatened with suit*. The United States filed a POC during Washington's bankruptcy, but Washington's bankruptcy was dismissed in February 2000, and the only letter the United States has submitted as evidence that it apprised Washington that his taxes were still delinquent is dated August 1, 2005. Gov't Exh. 17. The

United States has thus not shown that it sent any notification to Washington that would have apprised him that he was in imminent danger of suit in 2004.

35.     The fifth badge is whether the transfer was of essentially all of the Washington's assets.  The United States has not shown that the 2004 transfer depleted Washington's assets significantly and, in fact, Washington currently has substantial assets.

36.     There is insufficient evidence for the court to conclude that the ninth badge, whether Washington was insolvent or became insolvent shortly after the transfer was made, applies. While a debtor who is not paying his or her debts is presumed insolvent, *see* Tex. Bus. & Com. Code Ann. § 24.003(b), and Washington was not paying all of his *tax* debts, there was no testimony from which the court can conclude, one way or the other, whether Washington was paying his other debts in 2004.  Washington provided testimony indicating that he has somewhat substantial assets currently, so it is not clear, even though he had not paid his back taxes in 2004, that he was actually insolvent.

37.     After considering the testimony and evidence presented on all of the badges of fraud, the court finds as a matter of law that Washington did not have actual intent "to hinder, delay, or defraud any creditor of the debtor" when he transferred the Calumet Drive Property to Dorothy M.L. Washington and Dorothy M.L. Washington transferred the Property at Issue to Washington.  Accordingly, the United States' claim under section 24.005(a) fails.

### c.     Fraudulent Transfer: Section 24.006

38.     Under section 24.006(a) of the Texas Business and Commerce Code,

> A transfer made or obligation incurred by a debtor is fraudulent to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or

> obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex. Bus. & Com. Code Ann. § 24.006(a) (Vernon 2009).  Thus, in order to prove that a transfer was fraudulent under section 24.006(a), a creditor must show that (1) the creditor's claim arose prior to the property transfer; (2) the party to whom the property was transferred did not pay reasonably equivalent value for the property; and (3) the defendant was insolvent at the time of the transfer or became insolvent as a result of the transfer.  *Corpus*, 294 S.W.3d at 634.  A "transfer may . . . be shown to be fraudulent [under section 24.006] without any actual intent on the part of the debtor to hinder, delay, or defraud the creditor if the provisions of 24.006(a) are met."  *Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166, 178 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

39.     Here, there is no dispute that the United States' claim arose before the transfer was made—in 2004.  Washington merely claims that he did not *know* that he still owed the money in 2004 because he believed that the debt had been resolved during his bankruptcy.  However, the statute does not state that the debtor had to be *aware* that he owed the debt at the time of the transfer.  Texas courts have held that this statute does not require "a finding of 'malicious intent' or any actual intent to defraud," so Washington's knowledge of the debt, while relevant to a regular fraud analysis, is not relevant here.  *Esse*, 333 S.W.3d at 179.

40.     The court has already noted, in its discussion of the badges of fraud, that the transfers were not for "reasonably equivalent value" as defined by TUFTA, as neither Washington nor

Dorothy M.L. Washington received anywhere near the economic value of the property or properties each transferred from a creditor's perspective.[17]

41.    The third prong is insolvency.  "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  Tex. Bus. & Com. Code Ann. § 24.003(a) (Vernon 2009).  "A debtor who is generally not paying the debtor's debts as they become due is presumed insolvent."  *Id.* § 24.003(b).  Generally, when "a creditor attacks a conveyance . . .  made for valuable consideration, the burden of showing the debtor's insolvency at the time of the conveyance is on the creditor."  *Webster v. Strickland*, 87 S.W.2d 765, 767 (Tex. Civ. App. 1935), *aff'd Strickland v. Webster*, 131 Tex. 23, 112 S.W.2d 1047 (1938).  In the context of section 24.006(a) of TUFTA, the Fifth Circuit has noted that the claimant must prove that the transferor was insolvent at the time of the transfer.  *Askanase v. Fatjo*, 130 F.3d 657, 674 (5th Cir. 1997).  Insolvency, like reasonably equivalent value, is determined from the creditor's perspective.  *See Nat'l Loan Investors*, 98 S.W.3d at 784; *see also In re Martin*, 145 B.R. 933 (Bktcy. N.D. Ill. 1992) ("[T]he proper perspective for examining a debtor's solvency is to examine *from a creditor's perspective* what assets are available through various legal processes for payments of the debts.").

---

[17]  In determining "reasonably equivalent value" in the context of section 24.006, like the badges of fraud under 24.005, "whether the debtor received reasonably equivalent value for the property he transferred is determined from the creditor's perspective, *i.e.*, whether, from the reasonable creditor's viewpoint, the property received by the debtor has a reasonably equivalent value to the property conveyed beyond the creditor's reach." *Nat'l Loan Investors, L.P. v. Robinson*, 98 S.W.3d 781, 784 (Tex. App.—Amarillo 2003, pet. denied). "[I]f the legitimacy of a conveyance was determined from the perspective of the debtor, it is questionable whether any transfer could ever be considered fraudulent *viz* his creditors.  No doubt the debtor could always divine some explanation for transferring his property as he did, even though his creditors are left with nothing to satisfy the debt. He could always divine some subjective benefit which may by valueless to the creditor." *Id.* at 784 n.2.

42.     Here, the United States did not show that Washington was "generally not paying" his debts at the time of the transfer in 2004. While Washington had not paid his taxes from 1988, 1989, and 1990, as of 2004, the United States presented no evidence with regard to Washington's other bills or assets *as of the date of the transfer*. This failure to pay one debt is not sufficient to show that Washington was not paying his debts, in general, and thus is not sufficient to raise a presumption of insolvency. Therefore, the burden was on the United States to show that Washington's debts were greater than his assets. The United States did not present any evidence with regard to Washington's debts and assets as of the transfer date. The United States thus has failed to show that Washington was insolvent on the date of the transfer. Accordingly, the court finds, as a matter of law, that the transfer was not fraudulent under section 24.006(a).

### 3.     *The Trust Is Not a Sham Trust*.

43.     A trust that is a sham or one lacking economic substance will be disregarded for federal tax purposes and the property held in the trust will be treated as property of the taxpayer for purposes of tax collection. *Itz v. United States*, 1985 WL 1310, at *4 (W.D. Tex. Mar. 29, 1985). Courts consider the following factors to determine whether a trust is a sham: "1) whether the grantors themselves serve as trustees with powers so broad as to effectively allow them to allocate the entirety of the trust's assets and/or income to themselves; 2) whether the taxpayers have retained full use of the assets placed in trust; 3) whether the trust's assets have been used to pay personal expenses of the taxpayers; and 4) whether the trust's assets have been distributed to the putative beneficiaries of the trust." *United States*

*v. McMahan*, No. V-08-07, 2008 WL 5114651, at *5 (S.D. Tex. Dec. 3, 2008) (Rainey, J.) (citing *Itz*, 1985 WL 1310, at *4).

44.   Washington serves as a trustee of the Trust, and he exercises substantial power over the Trust's assets in this role.  He has, to some extent, allocated the Trust's assets to himself, as he used the Trust Bank Account to pay taxes for property that he, not the Trust, owns, and he used rent that he claims he paid to the Trust to pay off the mortgage of his own residence. While his residence is owned by a different trust, it is not owned by the Trust, so the use of funds that should have gone to the Trust in paying off a house in which Washington resides is fairly construed as using the Trust funds for his own benefit.  However, this case is not that simple.  The house is owned by a trust that has the same beneficiaries, in the same percentages, as the Trust.  So, even though Washington used Trust funds to pay off his residence that is owned by another trust, in the long run, the funds benefit the same beneficiaries.  Moreover, neither this transaction nor any of the other evidence of Washington's use of Trust assets is indicative of powers so broad that Washington could effectively allocate the entirety of the Trust's assets to himself.

45.   Washington maintains an office at 2323 Caroline, but he pays rent to do so.  Granted, he does not actually pay as much rent to the Trust as he originally claimed, particularly considering that some of the payments actually benefitted trusts other than the Trust, but the rent he has paid is not merely nominal.[18]  Thus, he does not enjoy "full use" of the office space.

---

[18]  The United States stressed that Washington does not pay $15,000 a month in rent, even though he claimed that he did.  During trial, it became clear that Washington's attitude about the amount of rent he pays to the Trust is rather lackadaisical, but he nevertheless clearly pays rent to the Trust.

46.     Washington has on occasion erroneously used funds from the Trust Bank Account for
personal expenses, and he used funds from the Trust Bank Account to pay ad valorem taxes
on property that he, personally, owns in Galveston.  However, the United States has not
shown that Washington regularly uses the Trust Bank Account for his own personal
expenses.

47.     Washington does not keep a written account of distributions he has made to the Trust
beneficiaries, but he does distribute the Trust's assets to his children for their education and
other expenses, and he periodically informs them about the Trust's status.

48.     On balance, the court finds that Washington's personal use of the Trust assets is not
substantial enough to render the trust a sham.

### 4.     *The Trust is Not Washington's Alter Ego or Nominee*.

49.     The "concepts of 'nominee' . . . and 'alter ego' are independent bases for attaching the
property of a third party in satisfaction of a delinquent taxpayer's liability."  *Oxford Capital
Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000).  "A nominee theory involves the
determination of the true beneficial or equitable ownership of the property.  An alter ego
theory focuses more on those facts associated with a 'piercing the corporate veil' analysis."
*Id.* (citation omitted).

### a)     *Alter Ego*

50.     To determine whether the Trust is Washington's alter ego, the court "must look at the totality
of the circumstances in considering" the following factors:

1) Whether Washington expended personal funds for the property;

2) Whether Washington enjoyed the benefits of the disputed property;

35

3) Whether a close family relationship existed between Washington and the Trust;

4) Whether Washington exercised dominion and control over the disputed property;

5) Whether the Trust interfered with Washington's use of the property;

6) Whether Washington owned the Trust;

7) Whether the Trust observes corporate (or trust) formalities;

8) Whether the Trust maintains bank accounts, books, and records;

9) Whether the Trust and Washington commingled funds;

10) The Trust's capitalization;

11) Whether Washington transferred assets, property, or funds to the Trust or vice versa;

12) Whether the Trust was organized by Washington;

13) Whether the Trust operated as a traditional trust;

14) Whether the Trust transacts Washington's business;

15) Whether the Trust pays Washington's personal obligations.

*See Century Hotels v. United States*, 952 F.2d 107, 110 & n.5 (5th Cir. 1992) (noting that the district court "correctly gleaned the important factors" to be considered when determining whether a company whose funds the IRS had seized was the alter ego of a taxpayer).

51.    The court finds that, on balance, the Trust is not the alter ego of Washington.  While (1) Washington expended personal funds for the Property at Issue by conveying the Calumet Drive Property to Dorothy M.L. Washington in what she perceived to be an even exchange; (2) the Trust beneficiaries are Washington's children; (3) Washington, as trustee, does not ensure that the Trust observes formalities such as written reports to beneficiaries and filing tax returns and does not keep adequate books or records; (4) Washington has used Trust

36

assets for some personal expenses; and (5) Washington offices in and generally manages a building owned by the Trust, these factors do not, considered in light of the totality of the evidence, demonstrate that the Trust is Washington's alter ego.  Washington (1) pays rent to the Trust for the use of the office; (2) advises the beneficiaries of the Trust's status from time to time; and (3) has no ownership interest in the Trust.  The Trust is not undercapitalized for its purpose, which is to serve as a means to provide for Washington's children in the future.  Additionally, there is only minimal evidence that Washington used the Trust's assets for personal use and that he intermingled his personal funds with the Trust's funds.  *Cf. Estate of Lisle v. C.I.R.*, 341 F.3d 364, 378 (5th Cir. 2003), *mandate recalled and modified on other grounds by* 431 F.3d 439 (5th Cir. 2005) (finding no alter ego when there was "only the slimmest evidence" that the debtor used his alleged alter ego's funds for personal purposes). And, while Washington organized the Trust, he did so several years before the Property at Issue was transferred to the Trust, and he did so for a legitimate purpose.

### b) Nominee

52.    "A nominee theory involves the determination of the true beneficial ownership of property." *Oxford Capital*, 211 F.3d at 284 (citations and internal quotations omitted).  "Specific property in which a third person has legal title may be levied upon as a nominee of the taxpayer if the taxpayer in fact has beneficial ownership of the property." *Id.*  The court must consider the following factors when determining nominee status:

(a) No consideration or inadequate consideration paid by the nominee;
(b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;
(c) Close relationship between transferor and the nominee;

37

(d) Failure to record conveyance;

(e) Retention of possession by the transferor; and

(f) Continued enjoyment by the transferor of benefits of the transferred property.

*Id.* at 284 n.1 (quoting *Tow Antique Ford Found. V. Internal Revenue Serv.*, 791 F. Supp. 1450, 1454 (D. Mont. 1992), *aff'd w/o opinion*, 999 F.2d 1387 (9th Cir. 1993)).

53.     Here, Dorothy M.L. Washington is the transferor of the properties upon which the United States seeks to foreclose.  When one considers Dorothy M.L. Washington, rather than Washington, to be the transferor, only the first factor, consideration, and the third factor, close relationship, weigh in favor of the nominee theory.  Dorothy M.L. Washington has a close relationship with two of the five owners of the Trust, who are her children.  As for consideration for the Property at Issue, the Trust paid the overdue ad valorem taxes on the two lots, which were subject to a judgment for overdue ad valorem taxes.  While this would likely be considered adequate consideration if the lots were the only property conveyed, it is not adequate consideration for the conveyance of 2323 Caroline, which is an income-producing property and was not encumbered by a judgment at the time of the conveyance. Dorothy M.L. Washington believed the consideration she received was adequate because she also received the Calumet Drive Property from Washington, but the nominee test asks only if adequate consideration was paid by the alleged nominee.

54.     The other factors weigh against nominee status.  Even if the court were to assume that *Washington* anticipated being sued for his 1988, 1989, and 1990 taxes in 2004—since Dorothy M.L. Washington's debt status is not at issue—and that Washington orchestrated the transfers in anticipation of this suit because his tax debt was not discharged in his bankruptcy, the transferor, Dorothy M.L. Washington did not continue to "possess" or

"enjoy" the property after the transfer because she discontinued collecting rent from the tenants of 2323 Caroline after the transfer.

55.    On balance, the factors weigh against nominee status if Dorothy M.L. Washington is considered the transferor.

56.    The United States argues that *Washington,* rather than *Dorothy M.L. Washington*, should be considered the transferor because Dorothy M.L. Washington transferred the Property at Issue in exchange for the Calumet Drive Property, so Washington was in constructive receipt of the Property at Issue before the transfer to the Trust.  The court makes no determination with regard to this proposition because, even if the court considers Washington, rather than Dorothy M.L. Washington, to be the transferor, the factors weigh against the nominee status. With Washington as transferor, like with Dorothy M.L. Washington as transferor, the consideration was inadequate and there was a close relationship between the transferor and the Trust, which weigh in favor of nominee status.  The other factors weight against nominee status.  First, there was no continued control, possession, and enjoyment of the Property at Issue by Washington because Washington never controlled, possessed, or enjoyed the property *as an owner*.  And, though Washington did possess and enjoy the property as a tenant prior to the transfer and continues to possess and enjoy the property as a tenant, the court finds it significant that Dorothy M.L. Washington received rent for Washington's use of the office building prior to the transfer, and Washington paid rent to the Trust after the transfer.  *Cf. United States v. Burnett*, No. C-09-286, 2010 WL 3941906, at *8-10 (S.D. Tex. Oct. 7, 2010) (Jack, J.) (finding the fact that the taxpayer did *not* pay rent to be of significance to the determination that a trust was the taxpayer's nominee).  Washington

simply never acted like the "true beneficial owner" of the property. The court therefore finds that the Trust is not merely the nominee owner of the property at issue.

57.  In sum, the United States may not reach the Property at Issue to satisfy Washington's 1990 tax debt because the Trust is an irrevocable Trust, it is not a sham, it is not Washington's alter ego or nominee, and the United States did not show that the transfer of the Property at Issue was fraudulent under TUFTA. The court notes, however, that this is a very close call and that its decision with regard to the 1990 taxes turns, in large part, on Washington's credibility. While the United States has certainly shown that Washington is a poor recordkeeper with regard to his personal finances and his obligations as a trustee and is in all respects significantly less than diligent in his duties as a trustee, the court believed Washington's testimony with regard to his intentions in setting up the Trust as an irrevocable trust to benefit his children and his attempt—or haphazard attempt—to manage the Trust and related trusts to effectuate that goal. If the court had not found this testimony credible, one or more of the balancing tests above undoubtedly would have tipped the other way.

### III. CONCLUSION

The federal tax liens against Washington and the Trust for the 1988 and 1989 tax years are valid and attach to the Property at Issue for the 1988 and 1989 tax years because the Property at Issue has continuously been subject to the "secret" lien under section 6321, title 26 of the U.S. Code, and there has been no subsequent purchaser, holder of a security interest, mechanic's lien or, or judgment lien creditor to destroy that lien. However, no "secret" lien attached to the Property at Issue with regard to the 1990 taxes because the 1990 taxes were not assessed until after Washington had conveyed the Property at Issue to Dorothy M.L. Washington. Additionally, the federal tax lien

against Washington for the 1990 taxes cannot now attach to the Property at Issue because the Property at Issue is owned by the Trust, not Washington, and the Trust is not a sham trust and it is not the alter ego or nominee of Washington.  Hence, the federal tax lien against Washington and against the Trust as Washington's nominee for the 1990 tax year is not valid.  Accordingly, the court hereby

ORDERS that the United States may foreclose the liens upon the Property at Issue for the 1988 and 1989 tax years.  The court further

ORDERS that, after costs of preservation and sale, $21,727.73 of the proceeds of the foreclosure sale of 2317 Caroline, $9,716.37 of the proceeds of the foreclosure sale of 2323 Caroline, and $4,813.28 of the proceeds of the foreclosure sale of 1313 McIlhenny, shall be distributed first to Defendant Lienholders, pursuant to the court's order granting summary judgment on July 20, 2011 (Dkt. 59).  The court further

ORDERS that, after costs of preservation and sale and after the aforementioned funds have been distributed to Defendant Lienholders, $444,255.22 shall be distributed to the United States for the 1988 taxes, penalties, statutory additions, and interest, and $66,875.47 shall be distributed to the United States for the 1989 taxes, penalties, statutory additions, and interest.

It is SO ORDERED.

Signed at Houston, Texas on September 6, 2011.

_____
Gray H. Miller
United States District Judge